UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHARLES M. DOUCOT,
 Plaintiff,

 v.           CIVIL ACTION NO.
             09-11482-MBB
IDS SCHEER, INC. and
IDS SCHEER AMERICAS, INC.,
 Defendants.

**MEMORANDUM AND ORDER RE:
MOTION TO DISMISS PLAINTIFF'S SECOND
AMENDED COMPLAINT (DOCKET ENTRY # 30);
MOTION TO DISMISS PLAINTIFF CHARLES DOUCOT'S
SECOND AMENDED COMPLAINT (PARTIAL MTD)
<u>(DOCKET ENTRY # 33)</u>**

**August 10, 2010**

**BOWLER, U.S.M.J.**

   Pending before this court are two motions to dismiss the second amended complaint (Docket Entry ## 30 & 33) filed by defendants IDS Scheer, Inc. ("IDS") and IDS Scheer Americas, Inc. ("IDS Americas") (collectively: "defendants"). Plaintiff Charles M. Doucot ("plaintiff") brings three claims for breach of contract, one claim for attorney's fees and one claim under Massachusetts General Laws chapter 149, section 148 ("MA Wage Act" or "section 148"). (Docket Entry # 28, Ex. A). Defendants move to dismiss various claims under Rule 12(b)(6), Fed. R. Civ. P. ("Rule 12(b)(6)"), for failure to state a claim upon which relief may be granted and Rule 12(b)(1), Fed. R. Civ. P. ("Rule 12(b)(1)"), for lack of subject matter jurisdiction. (Docket

Entry ## 30 & 33).

PROCEDURAL BACKGROUND

Plaintiff filed the complaint on September 8, 2009.  (Docket Entry # 1).  The original claims included two counts for breach of contract and one count for attorney's fees.  (Docket Entry # 1).  Subsequently, on September 10, 2009, plaintiff filed the first amended complaint which added a count under the MA Wage Act.  (Docket Entry # 6).

Defendants filed a motion to dismiss the first amended complaint on October 5, 2009.  (Docket Entry # 13).  On October 19, 2009, plaintiff filed an opposition to the motion to dismiss the first amended complaint.  (Docket Entry # 19).  On November 11, 2009, defendants filed a motion for leave to file a "Reply Brief in Support of Motion to Dismiss" with the proposed reply brief attached.  (Docket Entry # 24).  Plaintiff opposed that motion on November 19, 2009.  (Docket Entry # 26).

On November 30, 2009, this court heard argument on the motion to dismiss the first amended complaint.  This court took the motion (Docket Entry # 13) under advisement and also allowed plaintiff leave to file an amendment to the first amended complaint.  On December 15, 2009, plaintiff filed a motion to amend the first amended complaint with the second amended complaint attached as exhibit A.  (Docket Entry # 28).  On December 29, 2009, defendants filed a motion to dismiss the

2

second amended complaint.  (Docket Entry # 30).[1]  On January 11, 2010, plaintiff filed an opposition to the motion to dismiss the second amended complaint.  (Docket Entry # 31).

In open court on April 1, 2010, this court allowed the motion to amend the first amended complaint (Docket Entry # 28) and allowed defendants leave to file the reply brief (Docket Entry # 24).  Defendants agreed to withdraw the motion to dismiss the first amended complaint.  (Docket Entry # 13).  On April 15, 2010, defendants filed "a new motion to dismiss [addressing] all of the claims in the [second amended complaint]" ("partial motion to dismiss").  (Docket Entry # 33).[2]  Also on April 15, 2010, defendants filed an answer to the second amended complaint.

---

[1]  Plaintiff raised two procedural arguments in opposition to defendants' motion to dismiss (Docket Entry # 31).  First, plaintiff maintains that the motion to dismiss (Docket Entry # 30) fails to comply with Local Rule 7.1(b)(1) requiring defendants to file a memorandum of reasons in conjunction with the motion.  (Docket Entry # 31).  Defendants filed the motion and the supporting arguments in the same document.  "A district court possesses great leeway in the application and enforcement of its local rules."  U.S. v. Roberts, 978 F.2d 17, 20 (1st Cir. 1992).  Because the requirement of Local Rule 7.1(b)(1) is not jurisdictional and defendants have since filed a subsequent motion to dismiss in compliance with the rule, any noncompliance is harmless and does not warrant a denial of the motion.
  Second, plaintiff contends that the motion to dismiss "is improperly styled as a motion to dismiss the Second Amended Complaint, rather than an opposition to Plaintiff's Motion to Amended the Complaint."  (Docket Entry # 31).  This court's allowance of the motion to amend the first amended complaint with the second amended complaint moots the argument.

[2]  Defendants filed a memorandum in support (Docket Entry # 34) along with the partial motion to dismiss (Docket Entry # 33).

(Docket Entry # 37).  On April 28, 2010, plaintiff filed an opposition to the partial motion to dismiss.  (Docket Entry # 38).

FACTUAL BACKGROUND[3]

Plaintiff is an individual residing in Rowley, Massachusetts.  (Docket Entry # 28, Ex. A).  Defendants, wholly owned subsidiaries of the German corporation IDS Scheer AG ("IDS AG"), have a principal place of business in Berwyn, Pennsylvania.  (Docket Entry # 28, Ex. A).

On September 16, 2003, a certificate of amendment of IDS was filed with the Delaware Secretary of State's office changing IDS's name to "IDS Scheer Business Process Management, Inc." ("IDS BPM").  (Docket Entry # 15, Ex. A).  Subsequently, IDS BPM merged with four other entities under the name of "IDS Scheer Americas, Inc.," as evidenced by a certificate filed with the

_____

[3]  This court will consider the pleadings and various affidavits filed by both parties for purposes of the Rule 12(b)(1) analysis, but will not consider materials outside the pleadings in its Rule 12(b)(6) analysis.  See Id. ("the court generally may not consider materials outside the pleadings on a Rule 12(b)(6) motion, [but] it may consider such materials on a Rule 12(b)(1) motion"); see also Farley v. Shaw's Supermarkets, Inc., 497 F.Supp.2d 23, 25 (D.Mass. 2007) ("[i]n resolving any factual disputes regarding the existence of jurisdiction, a court may review any evidence, including any submitted affidavits and depositions") (citing Aversa v. United States, 99 F.3d 1200, 1210 (1st Cir. 1996)); White v. Commissioner of Internal Revenue, 899 F.Supp. 767, 771 (D.Mass. 1995) ("[t]he Court can look beyond the pleadings-to affidavits and depositions-in order to determine jurisdiction.").

State of Delaware on October 31, 2006.  (Docket Entry # 15, Ex. B).

In October of 2006, "defendants contacted [plaintiff] to discuss his interest in the position of 'Senior Vice President and General Manager Product Business Americas.'"  (Docket Entry # 28, Ex. A).  The "parties" negotiated the terms of an executive employment agreement ("the Agreement") via telephone and electronic mail while plaintiff resided in Massachusetts.  (Docket Entry # 28, Ex. A).  On October 27, 2006, plaintiff executed the Agreement.  (Docket Entry # 28, Ex. A).  The Agreement was between plaintiff and "IDS Scheer, Inc."  (Docket Entry # 28, Ex. 1).  The Agreement has a heading that reads, "IDS SCHEER AMERICAS."  (Docket Entry # 28, Ex. 1).

Section four of the Agreement sets out five forms of compensation to plaintiff:  "(1) Base Salary, (2) Bonus Compensation, (3) Fringe Benefits, (4) Reimbursement of Expenses, and (5) Sign-on Bonus."  (Docket Entry # 28, Ex. A & Ex. 1).  At the time of plaintiff's termination, he had an "annual salary of $315,000."  (Docket Entry # 28, Ex. A & Ex. 1).  The "Bonus Compensation . . . as more particularly described in Exhibit B" consisted of a "Plan Bonus" and a "Retention Plan 2010" bonus.  (Docket Entry # 28, Ex. 1).  According to the Agreement, "All bonuses . . . shall be withheld and paid in accordance with the Company's normal payroll practice for its similarly situated

employees."  (Docket Entry # 28, Ex. 1).

The Agreement contained an employment term "commencing on 01st December 2006, subject to the provision of Section 7." (Docket Entry # 28, Ex. 1).  Section seven on "Early Termination" addressed "Termination Without Cause" in subsection (d).  (Docket Entry # 28, Ex. A & Ex. 1).  "The Company" had the right to "terminate the Executive's employment under [the] Agreement at any time for any reason or no reason by giving the Executive fourteen (14) days prior written notice of such termination." (Docket Entry # 28, Ex. 1, § 7(d)).  In the event of a termination without cause, subsection 7(d) dictated that:

> (i) the Executive shall be entitled to receive all *earned* but unpaid (*as of the effective date of such termination*) Base Salary, pro-rated bonuses under Section 4(b), fringe benefits under Section 4(c) and business expense reimbursements under Section 4(d); and
> (ii) the Company shall continue to compensate the Executive under Sections 4(a) and 4(c) (subject to the terms of any benefit or compensation plan then in force and applicable to the Executive) for six (6) months following such termination.

(Docket Entry # 28, Ex. 1, § 7(d)) (emphasis added).

As stated in the complaint, on May 18, 2009, "newly appointed Chief Executive Officer of IDS Scheer, Inc.," Joerg Heisterman, and "Regional Human Resources Director of IDS Scheer, Inc., Amy Goldberg" ("Goldberg"), informed plaintiff of his termination "ostensibly because Defendants were eliminating his position."  (Docket Entry # 28, Ex. A).  Plaintiff's employment

terminated on June 1, 2009.  (Docket Entry # 28, Ex. A).

In accordance with subsection 7(d)(ii), plaintiff's severance period ran from June 1, 2009 to December 1, 2009. (Docket Entry # 28, Ex. A).  According to plaintiff, under the terms of "the vacation program generally available to officers of the Company," plaintiff was "entitled to two and a half weeks of vacation" during the six month severance period.  (Docket Entry # 28, Ex. A).  Defendants have not "provide[d] any pay-out to [plaintiff] for his vacation days during his six-month severance period."  (Docket Entry # 28, Ex. A).  The amount of "a pay-out of his vacation days based on his annual salary of $315,000 [would be] $15,144.23."  (Docket Entry # 28, Ex. A).

When the complaint was filed, defendants had not provided plaintiff with a calculation or payment of any amount under the "Bonus Plan."  (Docket Entry # 28, Ex. A).  According to plaintiff, the "amount exceeds $200,000."  (Docket Entry # 28, Ex. A).  "As of the date of [his] termination, [he] had earned . . . at least $21,000 (prorated for the portion of the year that [he] was employed) under the 2009 Plan Bonus."  (Docket Entry # 20).[4]

Additionally, defendants "have not paid him for achieving one of the milestones listed in the Retention Plan 2010 bonus

---

[4]  That plaintiff claims he earned "at least $21,000" is considered only as a part of the amount in controversy analysis. See Spielman v. Genzyme Corp., 251 F.3d 1, 5 (1st Cir. 2001).

scheme." (Docket Entry # 28, Ex. A). Under the Agreement "the
Company" would pay plaintiff "an additional and maximum bonus of
$500,000 . . . provided that IDS Scheer AG meets the [listed]
performance goals in 2010." (Docket Entry # 28, Ex. 1, § 4(b) &
Ex. B). In no uncertain terms, exhibit B to the Agreement,
states that plaintiff begins to earn that bonus "when more than
70% of the goal has been met." (Docket Entry # 28, Ex. 1, Ex.
B). One of the goals is to "Grow [IDS AG] corporate revenue Euro
350k in 2010 over 2006 revenue" and is allocated 30% of the
maximum $500,000 bonus. (Docket Entry # 28, Ex. 1, Ex. B).
According to plaintiff, "Defendants achieved this goal in 2007 by
increasing IDS Scheer, Inc.'s revenue by €39.5 million in 2007."
(Docket Entry # 28, Ex. A).

Another of the goals, which is allocated 30% of the total
Retention Plan 2010 bonus, is to "achieve 14% EBITA for overall
corporation in 2010." (Docket Entry # 28, Ex. A). The last
goal, allocated 40% of the bonus, requires IDS "Americas to be
45% of worldwide product revenues (new license, ARIS consulting
and software-maintenance revenue) by 2010." (Docket Entry # 28,
Ex. A & Ex. 1, § 4(b) & Ex. B).

Goldberg avers that, "If annual bonuses are based upon the
performance of IDS or a division or affiliate thereof, those
bonuses are traditionally paid to employees by the end of the
first quarter following the close of the prior calendar year."

(Docket Entry # 14).  Furthermore, Goldberg assured, "If, after the close of calendar year 2009, it is determined that Mr. Doucot is eligible for a bonus, such bonus would be calculated pursuant to the terms of his Executive Employment Agreement and he would be paid his prorated bonus in the ordinary course in the first quarter of 2010."  (Docket Entry # 14).

On May 20, 2009, plaintiff sent Goldberg an e-mail regarding the "amounts owed to [him] by IDS."  (Docket Entry # 20). Goldberg responded on May 21, 2009, that "IDS Scheer determined that the bonus under [the Retention Plan 2010] was not earned as of [his] termination and therefore was not payable."[5]  (Docket Entry # 20).  On May 26, Goldberg e-mailed plaintiff "stating that the calculation of [his] 2009 bonus would be completed in June" but it "was never provided to [him]."  (Docket Entry # 20).

On March 12, 2010, plaintiff "received a bonus check from IDS Scheer in the pre-tax amount of $58,041.67 . . . for [the] bonus payment for the year ending 2009."  (Docket Entry # 38, Ex. A).  On March 18, 2010, Amy Goldberg responded to plaintiff's "request for information regarding the calculation and metrics of [his] 2009 bonus" by stating, "[I]t would be appropriate for this information to be addressed within the course of the litigation."

---

[5]  As previously noted, subsection 7(d)(I) provides that where, as here, the executive is termintated without cause, he is entitled to "all earned by unpaid . . . pro-rated bonuses." (Docket Entry # 28, Ex. 1, § 7(d)(i)).

(Docket Entry # 38, Ex. A).  As of March 25, 2010, "the Software
AG Group [held] more than 91 percent of the equity shares of IDS
Scheer AG."  (Docket Entry # 32).

STANDARD OF REVIEW

     For purposes of the motions to dismiss the second amended
complaint (Docket Entry ## 30 & 33) filed under Rule 12(b)(1) and
Rule 12(b)(6), this court takes "all factual allegations in the
complaint as true."  Moldonado v. Fontanes, 568 F.3d 263, 266
(1st Cir. 2009) (quoting Ashcroft v. Iqbal, __ U.S. __, 129 S.Ct.
1937, 1949-50 (2009)).  This court "need not accept as true legal
conclusions from the complaint or '"naked assertion[s]" devoid of
"further factual enhancement."'"  Id. (quoting Bell Atlantic
Corp. v. Twombly, 550 U.S. 544, 557 (2007)).  This court notes
that "Solely for the purposes of this Motion to Dismiss do the
Defendants accept the well-pleaded factual allegations in the
[second amended complaint]."  (Docket Entry # 17, p. 1, n.1).

     Under Rules 12(b)(1) and Rule 12(b)(6), this court may
consider the well pleaded factual allegations in the second
amended complaint (Docket Entry # 28, Ex. A) as well as the
Agreement attached thereto (Docket Entry # 28, Ex. 1) without
converting the motion into one for summary judgment.  See Trans-
Spec Truck Service, Inc. v. Caterpillar, Inc., 524 F.3d 315, 321
(1st Cir. 2008) ("[e]xhibits attached to the complaint are
properly considered part of the pleading 'for all purposes,'

including Rule 12(b)(6) motions"); <u>Gonzales v. United States</u>, 284
F.3d 281, 288 (1st Cir. 2002) ("attachment of exhibits to a Rule
12(b)(1) motion does not convert it to a Rule 56 motion").  As
previously addressed, this court will consider the pleadings and
various affidavits filed by both parties for purposes of the Rule
12(b)(1) analysis, but will not consider materials outside the
pleadings in its Rule 12(b)(6) analysis.  <u>See</u> <u>Id.</u>; <u>see also</u> <u>White
v. Commissioner of Internal Revenue</u>, 899 F.Supp. at 771.

<u>DISCUSSION</u>

Defendants' partial motion to dismiss (Docket Entry # 33)
elaborates on the arguments made in the earlier motion to dismiss
(Docket Entry # 30), except in one respect.  The earlier motion
argues that, "Plaintiff has not made a good faith representation
of the actual amount in controversy."  (Docket Entry # 30).
Accordingly, this court examines the earlier motion to dismiss
(Docket Entry # 30) for purposes of the amount in controversy
arguments and the partial motion to dismiss (Docket Entry # 33)
when deciding the failure to state a claim and ripeness
arguments.

Defendants attack the claims with four main arguments:  (1)
plaintiff has not made a good faith representation of the amount
in controversy for diversity jurisdiction under 28 U.S.C. §
1332(a) (Docket Entry # 30); (2) dismissal of all claims against
IDS is proper because "it no longer exists as an entity" (Docket

11

Entry # 33); (3) with respect to IDS Americas, counts II, IV and part of V fail to state "any cognizable claim" upon which relief may be granted under Rule 12(b)(6) (Docket Entry # 33); and (4) also with respect to IDS Americas, counts II, IV and part of V are not ripe for adjudication and thus this court lacks subject matter jurisdiction over them pursuant to Rule 12(b)(1) (Docket Entry # 33).  This court addresses these four overarching arguments in turn.

I.  <u>Amount in Controversy</u>

Defendants argue that diversity jurisdiction does not attach in this matter because plaintiff has not made a good faith representation of the actual amount in controversy.  (Docket Entry # 30).  They contend plaintiff cannot meet the $75,000 requirement because the causes of action:  (1) "are not ripe for adjudication"; (2) "seek damages that are based upon a misrepresentation of the plain language of the Agreement regarding a 2010 bonus"; (3) "seek damages for the non-existent claim for attorney's fees"; and (4) "seek damages under The Wage Act that are not recoverable as a matter of law."  (Docket Entry # 30).  "If [a federal] court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P., Rule 12(h)(3).

For a district court to have original diversity jurisdiction over a civil action the amount in controversy must exceed the sum

or value of $75,000.  See 28 U.S.C. § 1332(a).  "[T]he amount specified by the plaintiff controls, as long as that amount is asserted in good faith."  Barrett v. Lombardi, 239 F.3d 23, 30 (1st Cir. 2001); see St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283 (1938) (focusing primarily upon the plaintiff's "good faith" in alleging the amount in controversy); Amoche v. Guarantee Trust Life Insurance Company, 556 F.3d 41, 49, n.3 (1st Cir. 2009); Coventry Sewage Associates v. Dworkin Realty Co., 71 F.3d 1, 4 (1st Cir. 1995).

"Once the damages allegation is challenged . . . 'the party seeking to invoke jurisdiction has the burden of alleging with sufficient particularity facts indicating that it is not a legal certainty that the claim involves less than the jurisdictional amount.'"  Spielman v. Genzyme Corp., 251 F.3d 1, 5 (1st Cir. 2001).  Along with plaintiff's opposition to defendants' motion to dismiss the first amended complaint, plaintiff also filed an affidavit (Docket Entry # 20)[6] detailing how and why he calculated the amounts claimed in the first amended complaint. Plaintiff attached as exhibits to the affidavit the Agreement and IDS AG's 2007 Annual Report ("the 2007 Report").  (Docket Entry # 20, Ex. 1 & 2).

---

[6]  Spielman v. Genzyme Corp., 251 F.3d 1, 5 (1st Cir. 2001) ("[a] party may meet this burden [of alleging with sufficient particularity facts indicating that it is not a legal certainty that the claim involves less than the jurisdictional amount] by amending the pleadings or by submitting affidavits").

"For the purpose of establishing diversity jurisdiction, the amount in controversy is determined by looking to the circumstances at the time the complaint is filed." <u>Coventry Sewage Associates v. Dworkin Realty Co.</u>, 71 F.3d at 4.  In the first amended complaint, filed on September 10, 2009, plaintiff alleged that, "Defendants have failed to remit payment for his earned but unpaid 2009 compensation bonus under the Agreement's Plan Bonus," which "[o]n information and belief . . . exceeds $200,000" and further that, "[P]ursuant to the formula stated in the Retention Plan, Mr. Doucot is owed approximately $350,000." (Docket Entry # 6).  On its face, then, "these causes of action have the collective potential to reap a harvest well in excess of $75,000." <u>Corrada Betances v. Sea-Land Service, Inc.</u>, 248 F.3d 40, 45 (1st Cir. 2001).

Three situations where the legal certainty standard defeats subject matter jurisdiction include:  "1) when the terms of a contract limit the plaintiff's possible recovery; 2) when a specific rule of substantive law or measure of damages limits the amount of money recoverable by the plaintiff; and 3) when independent facts show that the amount of damages was claimed by the plaintiff merely to obtain federal court jurisdiction." <u>See Westinghouse Electric Co., LLC v. Healy</u>, 502 F.Supp.2d 138, 141, n.4 (D.Me. 2007) (citing Charles Wright & Arthur Miller, 14B <u>Wright and Miller</u> § 3702, at 98-101 (1998)).  The Agreement by

its terms does not limit the amount recoverable under the Bonus
Plan or the Retention Plan to less then $75,000.  Furthermore, no
rule of law or measure of damages applies to this situation
limiting the amount recoverable to less than $75,000.  Finally,
nothing in the record suggests plaintiff claimed the amount of
damages merely to obtain federal jurisdiction and defendants do
not so argue.

Regarding plaintiff's 2009 Plan Bonus, he attests, "My
goals for the annual Plan Bonus were negotiated each year [and] I
earned bonus amounts, in part, upon achievement of 70% of the
relevant goal and, in full, upon achievement of more than 130% of
the relevant goal."  (Docket Entry # 20).  According to the
"Annual Bonus Payment 2009 - Charles Doucot" Table (Docket Entry
# 20, Ex. 1) at 100% achievement plaintiff would receive
$210,000.  (Docket Entry # 20, Ex. 1).  If, for instance,
plaintiff met 100% of the two revenue goals, "Revenue ARIS Region
North America" and "Revenue Consulting Region North America,"
prior to his termination, he could have earned $63,000 and
$42,000 respectively.  At the time plaintiff filed the complaint,
"Defendants [had] failed to provide Mr. Doucot with either the
calculation or the bonus, itself."  (Docket Entry # 6).  Taking
into consideration that plaintiff's employment was terminated
after six months in 2009, the evidence before this court does not
show "to a legal certainty, that the damages never could have

exceeded the jurisdictional minimum *such that* the claim was essentially feigned (colorable) in order to confer jurisdiction." Coventry Sewage Associates v. Dworkin Realty Co., 71 F.3d at 6 (emphasis in original).

This court notes that during the pendency of this matter plaintiff "received a bonus check from IDS Scheer in the pre-tax amount of $58,041.67." (Docket Entry # 38, Ex. A). While this amount is clearly below the $75,000 threshold, and may reduce any potential recovery, this circuit holds that "if events subsequent to commencement of the action reduce the amount in controversy below the statutory minimum, [a] federal court is not divested of jurisdiction." Id.

Based on the foregoing, at the time the claims were filed, see Stewart v. Tupperware Corporation, 356 F.3d 335, 338 (1st Cir. 2004), plaintiff demonstrated that it was not apparent to a legal certainty that the claims involved less than $75,000. This court therefore need not analyze the challenges to the good faith of the amounts claimed for the Retention Plan 2010, vacation pay, attorney's fees or Wage Act counts. Accordingly, the motion to dismiss argument regarding amount in controversy lacks merit.

II.   IDS's Existence for Litigation

Defendants move to dismiss all claims against IDS because that entity "no longer exists." (Docket Entry # 33). A corporation's capacity to sue or be sued is determined by the law

16

of the state under which it was organized.  See Rule 17(b)(2),
Fed. R. Civ. P.  The parties agree, and the evidence in the
record demonstrates, that IDS was organized in Delaware.  (Docket
Entry ## 19 & 34).  Therefore, Delaware law applies for
determining IDS's capacity to be sued.[7]

Defendants filed an affidavit of their counsel, Courtney
Worcester, supporting the partial motion to dismiss.  (Docket
Entry # 35).  It attests to two exhibits:  (1) a "Certificate of
Amendment of IDS Scheer, Inc., changing its name from 'IDS
Scheer, Inc.' to 'IDS Scheer Business Process Management, Inc.'"
("certificate of amendment"); and (2) a "Certificate of Merger
for the merger of IDS Scheer Business Process Management, Inc. .
. . with and into IDS Scheer Americas, Inc. under the name 'IDS
Scheer Americas, Inc.'" ("certificate of merger").  (Docket Entry
# 35).  The attached exhibits include both the certificates and

---

[7]  Plaintiff cites the First Circuit case, Shanahan, for the
proposition that, "even though dissolved the plaintiff
corporation still exists as a legal entity for the purposes of
this case."  Shanahan v. George B. Landers Construction Company,
Inc., 266 F.2d 400, 407 n.1 (1st Cir. 1959).  Even putting aside
the fact that Shanahan was not decided based on Delaware law,
this case is nonetheless distinguishable from Shanahan first
because in Shanahan the "plaintiff-appellee's brief . . .
incidentally asserted that the plaintiff corporation is 'now
dissolved.'"  Id. (emphasis added).  Here, defendants expressly
argue that under Delaware law IDS no longer exists.  Second, and
more importantly, the court in Shanahan noted that, "there [was]
nothing in the record to support the statement" that plaintiff
was dissolved.  Id.  Here, defendants submitted copies, with a
supporting affidavit, of the certificates of amendment and
merger, demonstrating the dissolution of IDS.  (Docket Entry #
12, Ex. A & B).

copies of certifications by the Secretary of State for the State
of Delaware, Harriet Smith Windsor, attesting to their accuracy.
(Docket Entry # 35, Ex. A & B).  This evidence demonstrates that
on or before September 16, 2003, the date when the certificate of
amendment was filed, IDS changed its name to "IDS Scheer Business
Process Management, Inc."  (Docket Entry # 35, Ex. A).  It
further shows that on or before October 31, 2003, the date when
the certificate of merger was filed, IDS Scheer Business Process
Management, Inc. merged with and into IDS Scheer Americas, Inc.
(Docket Entry # 35, Ex. B).[8]

Title 8, Section 259 of the Delaware Code ("section 259")
describes the status, rights and liabilities of constituent and
surviving corporations following a merger or a consolidation.
See 8 Del.C. § 259.  It states in pertinent part:

> When any merger or consolidation shall have become effective
> under this chapter, for all purposes of the laws of this
> State the separate existence of . . . all such constituent
> corporations except the one into which the other or others
> of such constituent corporations have been merged . . .
> *shall cease* and the constituent corporations shall . . . be
> merged into 1 of such corporations . . . and all debts,
> liabilities and duties of the respective constituent
> corporations shall thenceforth attach to said surviving or
> resulting corporation, and may be enforced against it to the
> same extent as if said debts, liabilities and duties had
> been incurred or contracted by it.

---

[8]  While this court may look to affidavits when considering
a motion under Rule 12(b)(6), under In re Mailman Steam Carpet
Cleaning Corp., 196 F.3d 1, 6 n.2 (1st Cir. 1999), this court may
also take judicial notice of information in the public record to
which there is no objection as to its authenticity.

8 Del.C. § 259 (emphasis added).

"When a consolidation or merger has taken place under the statute, the old corporations have their identity absorbed into that of . . . the one into which they were merged." <u>Argenbright v. Phoenix Finance Co. of Iowa</u>, 187 A. 124, 126 (Del.Ch. 1936). The Court of Chancery of Delaware in <u>Beals</u> granted a defendant's motion to quash the service of process on a constituent, or non-surviving, entity. <u>See</u> <u>Beals v. Washington International, Inc.</u>, 386 A.2d 1156 (Del.Ch. 1978). The court stated, "Since [the moving defendant] is the corporation into which [the other entity] was merged, it is liable for all the debts, liabilities and duties of [that other entity]." <u>Id.</u> at 1160. The court reasoned, "[I]t should be kept in mind that corporations exist only by legislative act. [Since] by statute, corporate existence is terminated on the date of merger . . . a corporation ceases to exist on merger for all purposes, including service of process, unless the legislature provides otherwise." <u>Id.</u> at 1161.

Plaintiff relies on Title 8, section 278 of the Delaware Code ("section 278") for the proposition that:

> [a]ll corporations, whether they expire by their own limitation or are otherwise dissolved, shall nevertheless be continued, for the term of 3 years from such expiration or dissolution or for such longer period as the Court of Chancery shall in its discretion direct . . . for the purpose of prosecuting and defending suits.

19

8 Del.C. § 278.  Section 278 does not apply here for the
following reasons.

Under Delaware common law, "the dissolution of a corporation
terminated its existence as a legal entity." City Investing Co.
Liquidating Trust v. Continental Casualty Co., 624 A.2d 1191,
1194 (Del. 1993) (citing In re Citadel Industries, Inc., 423 A.2d
500, 503 (Del.Ch. 1980)).  "In order to formalize the continued
existence of corporate assets and to provide a mechanism for the
assertion of claims as part of the 'winding up' process, the
Delaware General Corporation Law continues the corporation's
existence by operation of law." Id.  "In tandem, [sections 278
and 279] insure that whether a corporation is dissolved
voluntarily by its shareholders or for nonpayment of taxes, it
remains a viable entity authorized to possess property as well as
sue and be sued incident to the winding up of its affairs."  Id.
at 1195 (citing Addy v. Short, 89 A.2d 136, 140 (Del.Supr.
1952)).  "The intention of § 278 is to balance the public policy
interest of ensuring that claimants have adequate time to bring
claims against the corporation."  In re Down Chemical
International Inc. of Delaware, 2008 WL 4603580, *2 (Del.Ch. Oct.
14, 2008) (citing In re RegO Co., 623 A.2d 92, 95 (Del.Ch.
1992)).

Here, IDS BPM merged with and into IDS Americas pursuant to
Title 8, section 252 of the Delaware Code.  (Docket Entry # 35,

Ex. B).  In turn, section 259 operated to transfer IDS BPM's assets and liabilities to the surviving entity, IDS Americas. See, e.g., Gould v. American Hawaiian Steamship Company, 331 F.Supp. 981, 998 (D.Del. 1971) ("the surviving corporation after the merger . . . possesses all rights and powers of [the dissolved company] as well as all liabilities and duties") (citing 8 Del.C. § 259).

Section 278 is not evoked in this case because it is not necessary to ensure that plaintiff has adequate time or a viable entity to sue.  Cf. Aluminum Company of America v. Beazer East, Inc., 124 F.3d 551 (3rd Cir. 1997) (citing City Investing, 624 A.2d 1191 (Del. 1993)).  Where a surviving company "is an ongoing entity, with an existence separate from the dissolved corporation, which received corporate assets and assumed corporate obligations . . . § 278 of Delaware's General Corporation Law [does] not bar suit against [the surviving company]."  Id.

Plaintiff further argues, "[I]t is premature to dismiss [IDS] as a defendant at this stage of the proceedings, particularly where that entity entered into a contract with Mr. Doucot more than three years after it allegedly changed its name."  (Docket Entry # 19).  Plaintiff suggests he "should at least be entitled to discovery and an opportunity to submit evidence on the issue of the [IDS] corporate status."  (Docket

Entry # 19).  Although the Agreement states it was "made on 27th of October, 2006, by and between Charles Doucot. . . and *IDS Scheer, Inc.*, a Delaware corporation with offices located at 1055 Westlakes Drive, Suite 100, Berwyn, Pennsylvania 19312" (Docket Entry # 28, Ex. A) (emphasis added), the inconsistency[9] is not dispositive of the issue in light of the plain language of sections 252 and 259, and the Delaware case law.  The foregoing introductory paragraph of an "Executive Employment Agreement" cannot serve to unwind the merging of two or more entities and the resulting legal consequences.

For the foregoing reasons, this court finds that under Delaware law, IDS no longer existed at the time plaintiff filed the complaint and all of IDS's debts and liabilities transferred to IDS Americas on the date of their merger.

III.  <u>Failure to State a Claim and Ripeness</u>

Defendants move, under Rule 12(b)(6) to dismiss Count II, failure to pay the Retention Plan 2010 bonus, Count IV,

---

[9]  This court additionally notes that the heading of the Agreement states, "IDS SHEER AMERICAS" and the address provided for "IDS Scheer, Inc." in the opening paragraph is the identical address to the one listed in the certificate of merger, which states, "The agreement and plan of merger is on file at the office of IDS Scheer Americas, Inc. at 1055 Westlakes Drive, Suite 100, Berwyn, Pennsylvania 19312, which shall be an office of the surviving corporation."  This evidence suggests that the use of "IDS Scheer, Inc." in the body of the Agreement was in error.  That said, the discrepancy is not determinative of the analysis.

requesting attorneys' fees, and the part of Count V under the MA
Wage Act "with respect to Doucot's 2009 Plan Bonus and the
Retention Plan 2010 bonus." (Docket Entry # 34). Defendants
argue that these counts fail "to state any cognizable claim upon
which relief can be granted." (Docket Entry # 34). Defendants
also move under Rule 12(b)(1) to dismiss these three counts
because they are "currently unripe for adjudication" and thus
this court lacks subject matter jurisdiction. (Docket Entry #
33). This court first addresses the general standard for the
Rule 12(b)(6) challenges, and then focuses on each challenged
count in turn.

A. <u>Rule 12(b)(6) Failure to State a Claim Standard</u>

To survive a motion to dismiss under Rule 12(b)(6), "the
complaint must 'contain sufficient factual matter, accepted as
true, to "state a claim to relief that is plausible on its
face."'" <u>Cunningham v. National City Bank</u>, 588 F.3d 49, 52 (1st
Cir. 2009) (quoting <u>Ashcroft v. Iqbal</u>, __U.S.__, 129 S.Ct. 1937,
1949 (2009)). "A 'plausible' claim is one in which the court can
draw a 'reasonable inference that the defendant is liable for the
misconduct alleged." <u>Alston v. Massachusetts</u>, 661 F.Supp.2d 117,
120 (D.Mass. 2009).

Here, under Pennsylvania law[10] "[a] cause of action for breach of contract must be established by pleading (1) the existence of a contract . . . (2) a breach of a duty imposed by the contract and (3) resultant damages." CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa.Super.Ct. 1999); see also Boyd v. Rockwood Area School District, 907 A.2d 1157 (Pa.Cmwlth. 2006). "While not every term of a contract must be stated in complete detail, every element must be specifically pleaded." Snaith v. Snaith, 422 A.2d 1347, 1349 (Pa.Super.Ct. 1980).

B.  Count II - Failure to Pay the Retention Plan 2010 Bonus

Plaintiff alleges in Count II that, "Under the Agreement, [d]efendants are obligated to pay Mr. Doucot under the 'Retention Plan 2010' if certain benchmark goals are achieved." (Docket Entry # 28, Ex. A, Ex. 1). Additionally, "The benchmark goals have been achieved and Mr. Doucot has earned a minimum of $350,000 as a result." (Docket Entry # 28, Ex. A, Ex. 1). Finally, "Defendants have failed [and] refuse to compensate Mr.

---

[10]  The Agreement contains a "Governing Law" clause which states, "This Agreement shall be construed and interpreted and its performance shall be governed by the laws of the State of Pennsylvania without regard to conflicts of law principles of any jurisdiction." (Docket Entry # 28, Ex. 1). Since there is no policy interest which would override this choice and because the parties do not challenge application of Pennsylvania law, this court gives effect to that choice of law. See Northern Insurance Co. of New York v. Point Judith Marina, LLC, 579 F.3d 61, 71 (1st Cir. 2009) (citing Restatement (Second) of Conflict of Laws § 187 (1971)).

Doucot . . . [and he] is entitled to damages under the Agreement based on Defendants' breach of contract." (Docket Entry # 28, Ex. A).  Attached to the second amended complaint is a copy of the Agreement, complete with exhibit B comprising of the Plan Bonus and Retention Plan 2010 bonus goal tables.  (Docket Entry # 28, Ex. A & Ex. 1).

Both parties stipulate that the contract attached to the second amended complaint is the Agreement at issue in this litigation.  (Docket Entry # 28, Ex. A; Docket Entry # 37).  The Retention Plan 2010 bonus language therein reads:

> [T]he Company will pay the Executive an additional and maximum bonus of $500,000 in accordance with the table below provided that IDS Scheer AG meets the following performance goals <u>in</u> 2010:
>
> Corporate Revenue:   Grow Corporate Revenue Euro 350k <u>in</u> 2010 over 2006 revenue
>
> EBITA:               Achieve 14% EBITA for overall corporation <u>in</u> 2010
>
> Product Revenue:     Americas to be 45% of worldwide product revenues (new license, ARIS consulting and software-maintenance revenue) <u>by</u> 2010
>
> The allocated bonus base will begin to be earned when more than 70% of the goal has been met (0% bonus at achievement of 70%), will be fully earned when 100% of the goal has been met, will end when more than 140% of the goal has been met (233,3% bonus at achievement of 140%).

(Docket Entry # 28, Ex. 1, Ex. A, Ex. B) (emphasis added).

Plaintiff submits that "[u]nder the Agreement, the bonus is earned if corporate revenue increases by €350,000 <u>by</u> 2010 over

the 2006 revenue." (Docket Entry # 28, Ex. A) (emphasis added). According to plaintiff, that goal was achieved in 2007 when "IDS Scheer, Inc.'s revenue [increased] by €39.5 million." (Docket Entry # 28, Ex. A). Plaintiff further alleges that he "is entitled to a prorated share of the 'EBITA' and 'Product Revenue' bonuses included within the Retention Plan 2010." (Docket Entry # 28, Ex. A). Plaintiff reiterates, "The allocated Retention Plan 2010 is earned, in part, upon achievement of 70% of the relevant goal and, in full, upon achievement of more than 140% of the relevant goal." (Docket Entry # 28, Ex. A).

Starting with the "Corporate Revenue" goal, defendants argue both that plaintiff misrepresents the terms of the goal by substituting "by" for "in,"[11] and that "Doucot can never earn a bonus under the Retention Plan 2010 as his termination became effective on June 1, 2009, at which point he ceased to be eligible to earn any future bonuses or other compensation." (Docket Entry # 34). Plaintiff claims that he "and Defendants achieved this goal in 2007 by increasing [IDS's] revenue by €39.5 million." (Docket Entry # 28, Ex. A).

Plaintiff further responds with three arguments:  (1) defendants' "attempt to restrict the meaning of the term 'earned'

---

[11]  Plaintiff states, "Under the Agreement, the bonus is earned if corporate revenue increases by €350,000 by 2010 over the 2006 revenue" (Docket Entry # 28, Ex. A), while the Agreement reads, "Grow Corporate Revenue Euro 350k in 2010 over 2006 revenue" (Docket Entry # 28, Ex. 1).

under the Agreement . . . is belied by the clear language of the Agreement" (Docket Entry ## 19 & 38); (2) defendants "create an ambiguity in the Agreement, which results in a factual dispute that must be resolved by the fact-finder" (Docket Entry # 19); and (3) defendants' "termination of Mr. Doucot without cause . . . prevented him from being employed in 2010," thus he should still be able to earn a share of the bonus (Docket Entry # 19).

First, looking to the "clear language of the Agreement," the paragraph explaining when the "bonus base will begin to be earned" specifically references "the goal."[12]  (Docket Entry # 28, Ex. A).  The natural, plain and ordinary reading, see Cordero v. Potomac Ins. Co. of Illinois, 794 A.2d 897, 900 (Pa.Super.Ct. 2002), of this language informs that the time frame for each goal itself controls the timing for when that portion of the Retention Plan 2010 bonus begins to be earned.

Next, this court turns to whether the Retention Plan 2010 language is ambiguous as a matter of law.  See Drummond v. University of Pennsylvania, 651 A.2d 572, 580 (Pa.Cmwlth. 1994) ("the initial question is a legal one-whether the language is ambiguous . . . [and i]f it is clear, it is a question of law") (citing Hutchinson v. Sunbeam Coal Corp., 519 A.2d 385 (Pa.

---

[12]   The Agreement states, "The allocated bonus base will begin to be earned when more then 70% of the goal has been met . . ., will be fully earned when 100% of the goal has been met, will end when more than 140% of the goal has been met."  (Docket Entry # 28, Ex. 1) (emphasis added).

1986)).  "'A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'"  Trizechahn Gateway LLC v. Titus, 976 A.2d 474, 483 (Pa. 2009) (quoting Insurance Adjustment Bureau v. Allstate, 905 A.2d 462, 468-69 (Pa. 2006)).  "The 'reasonably' qualifier is important: there is no ambiguity if one of the two proffered meanings is unreasonable."  Id. (citing Murphy v. Duquesne University of the Holy Ghost, 777 A.2d 418, 430 (Pa. 2001) ("contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts")).

Neither the fact that plaintiff alters the plain language of the goal in the complaint, i.e. "[g]row Corporate Revenue Euro 350k by 2010 over 2006 revenue" (Docket Entry #28, Ex. A) (emphasis added), nor plaintiff's arguments regarding what was "explained to Mr. Doucot by the Defendants prior to acceptance of employment" (Docket Entry # 19), serve to create ambiguity in this part of the Agreement.  See ITT Corp. v. LTX Corp., 926 F.2d 1258, 1261 (1st Cir. 1991) ("[u]nder Massachusetts law, parol evidence may not be admitted to contradict the clear terms of an agreement, or to create ambiguity where none otherwise exists"); see also Governor Apartments Inc. v. Carney, 173 N.E. 287, 289 (Mass. 1961).  A court should not "distort the meaning of the language or resort to a strained contrivance in order to find an

ambiguity."  Madison Construction Co. v. Harleysville Mutual
Insurance Co., 735 A.2d 100, 106 (Pa. 1999).

Here, the language of when that goal is earned is quite
clear.  Plaintiff would fully earn the 30% allocated bonus for
the Corporate Revenue goal if IDS AG "[g]row[s] corporate revenue
Euro 350k in 2010 over 2006 revenue."  (Docket Entry # 28, Ex.
1).  Under the terms of the Agreement, plaintiff would begin to
earn the bonus when corporate revenue grows by 70% of the goal,
or $245k.  The growth of corporate revenue in 2010 must be over
2006 revenue.  It distorts the meaning of "in 2010" to say it
equates to "by 2010."  The word "in" is defined as "a function
word to indicate inclusion, location, or position within limits."
Merriam-Webster's Collegiate Dictionary (11th Ed. 2003).  There
must be an increase of revenue within the time limits of 2010.
The word "by" commonly means "not later than."  Id.  If the
Agreement stated, "by 2010," then it would mean "not later than
2010" and plaintiff's argument about the 2007 revenue increases
would hold true.

"Revenue" by definition is "the total income produced by a
given source."  Merriam-Webster's Third New International
Dictionary Unabridged (2002); see also, Black's Law Dictionary
(8th Ed. 2004) (defining revenue as "gross income or receipts").
Over the course of a fiscal year revenue either increases or it
does not change.  Therefore, given the clear language of the

Agreement stating "in 2010," the earliest plaintiff could earn a portion, or all, of the Corporate Revenue bonus would have been the first instance of 2010.  Because plaintiff could not have earned the Corporate Revenue goal until 2010 began and plaintiff's effective termination date was June 1, 2009, it follows that defendants had no duty to pay him that bonus under the terms of the Agreement.

Finally, plaintiff argues that he should be excused from the language in subsection 7(d)(i) on page six of the Agreement stating, "the Executive shall be entitled to receive all earned but unpaid (as of the effective date of such termination) . . . pro-rated bonuses" (Docket Entry # 28, Ex. A) because "it was the Defendants' termination of Mr. Doucot without cause that prevented him from being employed in 2010."  (Docket Entry # 19). The argument is unpersuasive.

Under Pennsylvania law, "[a] party 'may not, in fact, take advantage of an insurmountable obstacle placed, by himself, in the part of the other party's adherence to an agreement.  By preventing performance he also excuses it.'" Philadelphia Television Network, Inc. v. Reading Broadcasting, Inc., 2005 WL 1668346, *23 (Pa.Com.Pl. July 14, 2005).  The basis for this principle, known as the "prevention doctrine," is "the long-established principle of law that one should not be able to take advantage of his or her own wrongful act."  13 Williston on

Contracts § 39:6 (2000); <u>see also</u> <u>Craig Coal Mining Co. v.</u>
<u>Romani</u>, 513 A.2d 437, 440 (Pa.Super.Ct. 1986).

     The court in <u>Riseman v. Advanta Corp.</u>, the case plaintiff
cites, reasoned, "the jury could decide that [the company] fired
[the employee] in violation of the ADEA, thereby preventing him
from 'being here at the time.'" <u>Riseman v. Advanta Corp.</u>, 2001
U.S. Dist. LEXIS 15760, *18 (E.D.Pa. Sept. 12, 2001).  The
"wrongful act" upon which the company took advantage was the
violation of the ADEA.  Here, defendants have not engaged in a
"wrongful act."  On the contrary, defendants followed the
procedures and rights outlined in subsection 7(d) of the
Agreement and exercised the right to "terminate the Executive's
employment under [the] Agreement at any time for any reason or no
reason by giving the Executive fourteen (14) days prior written
notice of such termination."  (Docket Entry # 28, Ex. A).
Therefore, the excuse argument is without merit.  Plaintiff
therefore fails to plausibly plead a breach of contract claim for
the Corporate Revenue goal amount.

     Moving to the "EBITA" goal, for similar reasons addressed
above regarding the Corporate Revenue goal, plaintiff does not
allege a plausible claim.  The EBITA goal requires an
"achieve[ment of] 14% EBITA for the overall corporation <u>in</u> 2010."
(Docket Entry # 28, Ex. A) (emphasis added).  EBITA is an acronym
for "earnings before interest, taxes . . . and amortization."

Bukuras v. Mueller Group, LLC, 592 F.3d 255, 259 (1st Cir. 2010)
("the bonuses were conditioned on the Company meeting certain
financial targets, measured in terms of earnings before interest,
taxes, depreciation, and amortization (or, "EBITA")"). 
Logically, that percentage of earnings may only be calculated
after EBITA is determined for the entire corporation after the
end of 2010.[13]  Since plaintiff's effective termination date was
June 1, 2009, he could not have "earned" any of the bonus
allocated to the EBITA goal.

Turning finally to the "Product Revenue" goal, the language
is contradictory and ambiguous when read in context.  As
previously stated, "'A contract is ambiguous if it is reasonably
susceptible of different constructions and capable of being
understood in more than one sense.'"  Trizechahn Gateway LLC v.
Titus, 976 A.2d 474, 483 (Pa. 2009) (quoting Insurance Adjustment
Bureau v. Allstate, 905 A.2d 462, 468-69 (Pa. 2006)).  The first
paragraph of the Retention Plan 2010 language states that
plaintiff could receive a "bonus of $500,000 in accordance with
the table below provided that IDS Scheer AG meets the following

---

[13]  This court acknowledges that the word "in" under the
terms of the EBITA goal is ambiguous because it is unclear
whether the percentage goal must simply happen one time "in 2010"
or whether the percentage goal must be met based on the year end
EBITA financials for earnings "in 2010."  The former
interpretation seems unreasonable.  Regardless, this potential
ambiguity has no bearing on whether plaintiff "earned" the
allocated bonus as of plaintiff's termination on June 1, 2009.

performance goals in 2010." (Docket Entry # 28, Ex. A) (emphasis added).  The language of the Product Revenue goal itself then reads, "[IDS] Americas to be 45% of worldwide product revenues . . . by 2010." (Docket Entry # 28, Ex. A) (emphasis added).  Use of the preposition "by" in the Product Revenue goal contradicts the preposition "in" located in the general Retention Plan 2010 language above.  Taken together, "by" in the Product Revenue goal language could mean:  (1) "by the start of 2010" or "before 2010"; or (2) "by the end of 2010" or "by any time during 2010."  Given this ambiguity, "a trier of fact [could] be called upon to resolve conflicting parol evidence relevant to what the parties intended."  Id.

Regardless, the claim as it concerns the Product Revenue goal is not plausible because plaintiff could not have "earned" that portion of the bonus by his effective termination on June 1, 2009.  As previously mentioned under the EBITA goal analysis, a percentage goal may only logically be calculated at the end of the time frame for the goal.  This is because a percentage - in this case IDS Americas' percentage of "worldwide product revenues" - is susceptible to increasing and decreasing.  Here, the increasing and decreasing of the percentage of "worldwide product revenues" depends on the relative product revenue generated by the various divisions of the entire company, IDS AG.

It stands to reason, therefore, that the calculation of the percentage of the goal that has been "earned" must occur no earlier than at the *end* of the time frame for the goal.  Here, the end of that time frame, i.e. "by 2010" or sometime "in 2010," occurs at the earliest on the close of business on the last day before the start of 2010, i.e. December 31, 2009.  Therefore, plaintiff could not have "earned" the bonus under the Product Revenue goal by the time of his effective termination on June 1, 2009.

In sum, plaintiff does not meet the plausibility standard under Twombly[14] for all of Count II because he could not have earned any of the bonus goals by his effective termination date of June 1, 2009.  Since no part of Count II remains, there is no need to engage in a ripeness analysis for that count.

C.   Count IV - Attorney's Fees

In Count IV plaintiff claims, "[I]n the event that Mr. Doucot prevails in this action, he is entitled to reasonable attorney's fees, costs and disbursements."  (Docket Entry # 28, Ex. A).  Defendants move to dismiss this claim arguing it is not ripe for adjudication since "no party has yet prevailed in this action."  (Docket Entry # 34).  For the following reasons, the claim is treated as a request for relief, see Estate of Barrett

---

[14]   Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).

ex rel. v. United States, 337 F.Supp.2d 370, 372 n.1 (D.Mass. 2004) ("[b]ecause . . . 'Count XIII' is a request for attorneys' fees, I consider it a request for relief rather than a cause of action"), and the parties are instructed to move for attorneys' fees pursuant to Rule 54(d)(2)(A), Fed. R. Civ. P., following the entry of a final judgment in this matter.[15]

The "American Rule" for awarding attorney's fees is that they are "not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor [sic]." Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 717 (1967). In Pennsylvania, courts "consistently follow[] the general, American rule that there can be no recovery of attorneys' fees from an adverse party, absent an express statutory authorization, a clear agreement by the parties or some other established exception." Commonwealth v. Garzone, 993 A.2d 1245, 1255 (Pa.Super. 2010); see Mosaic Academy Charter School v. Com. Dept. of Education, 813 A.2d 813, 822 (Pa. 2002); see also Lucchino v. Commonwealth, 809 A.2d 264, 267 (Pa. 2002).

The First Circuit instructs, "When a contractual fee provision is included by the parties, the question of what fees

---

[15] Plaintiff requested attorney's fees in his "request for relief" sections of the first amended complaint (Docket Entry # 6) and second amended complaint (Docket Entry # 28, Ex. A). Defendants likewise requested attorneys' fees in their motion to dismiss the first amended complaint (Docket Entry # 13) and partial motion to dismiss the second amended complaint (Docket Entry # 33).

are owed 'is ultimately one of contract interpretation,' and [the court's] primary obligation is simply to honor the agreement struck by the parties." Accusoft Corp. v. Palo, 237 F.3d 31, 61 (1st Cir. 2001).  Here, the relevant contract provision states, "If an action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to recover, in addition to any other relief, reasonable attorneys' fees, costs and disbursements."  (Docket Entry # 28, Ex. A).

     "Attorney's fees can be either an element of damages to be proven at trial or a collateral matter to be determined following adjudication of the relevant claims." Pride Hyundai, Inc. v. Chrysler Financial Co., LLC, 355 F.Supp.2d 600, 602 (D.R.I. 2005).  "[C]ourts have differentiated between claims for attorney's fees based on 'prevailing party' contractual provisions and claims for attorney's fees based on other types of contractual provisions." Rockland Trust Company v. Computer Associated International, Inc., 2008 WL 3824791, *5 (D.Mass. Aug. 1, 2008) (collecting cases).  Where, as here, a "prevailing party" provision exists, courts treat the request for fees as collateral, since "the amount of attorney's fees does not become fully liquidated until conclusion of trial on the merits." Id. at *6 (finding no "traditional prevailing party provision" and holding "that CA's claim for attorney's fees would be viewed as a

substantial element of damages under the existing case law and must be proved to the trier of fact").

In this case, the Agreement provides that only the "prevailing party" is entitled to recover attorney's fees.  See, e.g., Creeks v. Creeks, 619 A.2d 754, 757-58 (Pa.Super.Ct. 1993) ("[i]n the event enforcement proceedings are instituted because of a[n] . . . alleged breach of this Agreement or any Court Order entered thereunder by either party, the prevailing party in such proceedings shall be entitled to an award of counsel fees for all time reasonably expended in connection with the enforcement of this Agreement").  The language in the Agreement does not expressly require a claim for fees to be tried during the case on its merits.  See De Lage Landen Financial Services, Inc. v. Rozentsvit, 939 A.2d 915, 924 (Pa.Super.Ct. 2007) ("the lease itself did not require [a party's] claim for costs to be tried during the case . . . [and] as such, the right to counsel fees arose as a function of the favorable verdict in the underlying litigation").  Therefore, while "the agreement in this case contained the necessary 'clear agreement of the parties' that in the event of a breach of the Agreement, the breaching party must pay the attorney fees," McMullen v. Kutz, 985 A.2d 769, 775 (Pa. 2009), the amount of such fees, if any, and the identity of the prevailing party is fully determinable only at the conclusion of the case.  Accordingly, this court awaits the final adjudication

on the merits before it will entertain requests for attorney's
fees.

As a final note, plaintiff asserts, "In light of Defendants'
concession that Mr. Doucot was owed his 2009 Plan Bonus, as
demonstrated by their payment of a 2009 Plan Bonus to Mr. Doucot
on or about March 15, 2010, . . . Defendants' arguments in
support of dismissal of Mr. Doucot's claim for attorneys' fees
pursuant to Count IV of the Second Amendment Complain are clearly
undercut."  (Docket Entry # 38).  This court finds that payment
of the 2009 Plan Bonus was in the ordinary course of IDS
America's bonus payment system (Docket Entry # 35, Ex. C), and
therefore, the payment of the "2009 Plan Bonus to Mr. Doucot on
or about March 15, 2010," did not by itself confer "prevailing
party" status on plaintiff at this point.  See, e.g., Profit Wize
Marketing v. Wiest, 812 A.2d 1270, 1275-76 (Pa.Super.Ct. 2002)
(prevailing party status "is still limited to those circumstances
where the fact finder declares a winner and the court enters
judgment in that party's favor[, and] . . . does not accompany a
compromise or settlement").

D.   Count V - MA Wage Act

Finally, plaintiff claims that he "is entitled to
remuneration for all earned but unpaid bonuses and benefits under
the Plan Bonus and the Retention Plan 2010, as well as pay-out
for his vacation days during his six-month severance period."

(Docket Entry # 28, Ex. A).   Further, "[d]efendants' failure to remit payment of these wages to Mr. Doucot is a violation of the [MA] Wage Act."   (Docket Entry # 28, Ex. A).   He relies on language in the MA Wage Act stating, "any employee discharged from such employment shall be paid in full on the day of his discharge."   Mass .Gen. L. ch. 149, § 148; (Docket Entry # 19).

Under Massachusetts law, to state a claim under the MA Wage Act, plaintiff "must prove (1) he was an employee under the statute; (2) his deferred compensation constitutes a 'wage' under the statute; [and] (3) the defendants violated the Act by not paying him his wages in a timely manner."   Stanton v. Lighthouse Financial Services, Inc., 621 F.Supp.2d 5, 10 (D.Mass 2009) (citing Allen v. Intralearn Software Corp., 2006 WL 1277813, *1 (Mass.App.Ct. Apr. 24, 2006)).   Plaintiff alleges all three in the complaint.   (Docket Entry # 28, Ex. A).   Defendants move to dismiss Count V insofar as it relates to plaintiff's bonuses because "his 'bonus' is not a type of wage that is covered by the [MA] Wage Act."   (Docket Entry # 34).   For the following reasons, this court finds that the bonuses are not "wages" protected by the MA Wage Act.

In an early decision, the Massachusetts Supreme Judicial Court concluded that the Massachusetts legislature enacted section 148 to limit "the interval between the completion of a work week and the payday on which the wages earned in that week

will be paid." <u>American Mutual Liability Insurance Co. v.</u>
<u>Commissioner of Labor and Industries</u>, 163 N.E.2d 19, 20 (Mass.
1959). "The statute was intended and designed to protect wage
earners from the long-term detention of wages by unscrupulous
employers." <u>Cumpata v. Blue Cross Blue Shield of Massachusetts,</u>
<u>Inc.</u>, 113 F.Supp.2d 164, 167 (D.Mass. 2000). The Massachusetts
Appeals Court has maintained a narrow scope of the MA Wage Act.
<u>See</u> <u>Id.</u>; <u>see</u>, <u>e.g.</u>, <u>Prozinski v. Northeast Real Estate Services,</u>
<u>LLC</u>, 797 N.E.2d 415, 419 (Mass.App.Ct. 2003) ("[w]e have
construed the wage act narrowly"); <u>Commonwealth v. Savage</u>, 583
N.E.2d 276, 278 (Mass.App.Ct. 1991) ("[f]rom the caption to that
act and from the placement of the provison [sic] in the weekly
payment statute, one infers a Legislative purpose to assist
employees who would ordinarily be paid on a weekly basis, such as
retail salespeople, and for whom commissions constitute a
significant part of weekly income").

"Where the language of a statute is plain, it is 'the sole
function of the courts . . . to enforce it according to its
terms.'" <u>D'Avella v. McGonigle</u>, 711 N.E.2d 882, 822-23 (Mass.
1999). The MA Wage Act requires employers to pay employess
earned wages "in a timely fashion, according to the parameters of
the statute." <u>Okerman v. VA Software Corp.</u>, 871 N.E.2d 1117,
1121 (Mass.App.Ct. 2007). It "refers to 'weekly' or 'biweekly'
wages having been earned during a particular pay period and

specifically includes in its definition 'holiday or vacation pay' as well as definitely determined commissions." Prozinski v. Northeast Real Estate Services, LLC, 797 N.E.2d at 420. Therefore, according to the Massachusetts Appeals Court, "[t]here is . . . no need to resort to the popular meaning of the term 'wages,' to Black's Law Dictionary, or to other statutes using the term 'wage.'" Id.; see NaviSite, Inc. v. Cloonan, 2005 WL 1528903, *13-14 (Mass.Super.Ct. May 11, 2005).

In dispute is whether the Bonus Plan and Retention Plan 2010 bonuses constitute "wages" under the MA Wage Act. The term "bonus" does not appear in the plain language of the act. See M.G.L. ch. 149, § 148. "Generally, bonuses are not 'wages earned' within the meaning of Mass. Gen. Laws ch. 149, § 148." Sterling Research, Inc. v. Pietrobono, 2005 WL 3116758, *12 (D.Mass. Nov. 21, 2005); see NaviSite, Inc. v. Cloonan, 2005 WL 1528903, at *13-14 ("retention bonus and the performance bonus . . . lie well outside the statute's reach"). Additionally, "[c]ourts have distinguished wages, which include assured compensation and compensation equivalents such as accrued vacation pay and sick leave, from compensation 'triggered by contingencies' [that are] thus outside the scope of the [MA] Wage Act." Dennis v. Jager, Smith & Stetler, P.C., 2000 WL 782946, *1 (Mass.Super.Ct. April 10, 2000) (holding that the plaintiff's

"substantial and irregular compensation, in the form of a draw, .
. . is not afforded the protections of the [MA] Wage Act").

Here, plaintiff appears to argue, without citation to
Massachusetts law, that the bonuses fall under the language
applying to commissions and suggests they are "definitely
determined." (Docket Entry # 19). Simply addressing the bonuses
in terms of commissions does not make them commissions under the
MA Wage Act. See Beaule v. M.S. Inserts and Fasteners Corp.,
2004 WL 1109796, *2 (Mass.Super.Ct. Feb. 24, 2004) ("[s]imply
because the [defendant's] employees called the bonuses
commissions, does not mean that they are commissions"). Here,
plaintiff argues, "[t]he Retention Plan 2010 was explained to Mr.
Doucot by the Defendants prior to his acceptance of employment to
act as an alternative to an employee equity plan that would
provide him with a vested interest in bonus payments in the same
way that an employee would obtain a stock grant or option."
(Docket Entry # 19). This is consistent with the Massachusetts
Supreme Court's understanding that, "The offer of a bonus is the
means frequently adopted to secure continuous service from an
employee, to enhance his efficiency and to augment his loyalty to
his employer." Attorney General v. Woburn, 58 N.E.2d 746, 747
(Mass. 1945).

"Massachusetts courts have held that the term 'commission'
refers to 'employees who would ordinarily be paid on a weekly

basis . . . and for whom commissions constitute a significant part of weekly income.'" Wilkie v. NETS, Inc., 2005 WL 3105692, *3 (Mass.Super.Ct. Oct. 16, 2005); Commonwealth v. Savage, 583 N.E.2d at 276.  "For purpose of the [MA] Wage Act, payments qualify as commissions under the Act only if they satisfy a series of factors: regularity of commission, regularity of commission payment, relation between salary and commission, and absence of triggering contingencies." Wilkie v. NETS, Inc., 2005 WL 3105692, at *3.  "Courts have held that where the payment is erratic, such as a yearly bonus, the payment does not constitute a commission as defined under the Act." Id.; cf. Dennis v. Jager, Smith & Stetler, P.C., 2000 WL 782946, at *1; see also Baptista v. Abbey Healthcare Group, Inc., 1996 WL 33340740, at *4 (D.Mass. April 10, 1996) (declining to extend definition of "wages" to stock options).

Given the foregoing Massachusetts case law the Plan Bonus and the Retention Plan 2010 bonus are not "wages" protected by the MA Wage Act.  Therefore, insofar as the Count V concerns these bonuses, it is subject to dismissal.


## CONCLUSION

For the foregoing reasons and in accordance with the analysis therein, the motion to dismiss (Docket Entry # 30) is

**DENIED,** and the partial motion to dismiss (Docket Entry # 33) is

**ALLOWED.**

                                                    /s/ Marianne B. Bowler
                                             **MARIANNE B. BOWLER**
                                             United States Magistrate Judge